<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MOHAMMAD MAHMOUD<br><br>                              Plaintiff,<br><br>v.<br><br>CITY OF PATERSON, POLICE CHIEF<br>JAMES WITTIG, POLICE DIRECTOR<br>MICHAEL WALKER<br><br>                              Defendants. | Civ. No.  10-5711 (DRD)<br><br><u>**O P I N I O N**</u> |

*Appearances by:*

Louis A. Zayas, Esq.
Law Offices of Louis A. Zayas, Esq.
8901 Kennedy Boulevard
North Bergen, N.J. 07047

    *Attorney for Plaintiff,*

Navarro Gray, Esq.
Hunt, Hamlin & Ridley
60 Park Place, 16th Floor
Newark, NJ 07102

    *Attorney for Defendants.*

<u>**DEBEVOISE, Senior District Judge**</u>

This case arises from allegations by a former City of Paterson police officer, Plaintiff Mohammad Mahmoud, against the City of Paterson and its Police Chief James Widding and Police Director Michael Walker (collectively, "Defendants"). Specifically, Mr. Mohammad Mahmoud alleges that his civil rights were violated when his service weapon was removed

1

pursuant to an investigation by the Passaic County Prosecutor's Office which was triggered by an incident of domestic violence with his wife.  This matter comes before the Court today on Defendants' motion for summary judgment to dismiss the complaint with prejudice.  For the reasons stated below, Defendants' motion is granted and the case is dismissed with prejudice.

## I. BACKGROUND

1. **Factual History**

On or about March 9, 2004, Mr. Mahmoud and his then-wife, Mrs. Samara Hajisniel, were involved in a domestic dispute which culminated in the police being summoned to the home.  As a result, a domestic violence complaint, a Temporary Restraining Order ("TRO"), and a criminal complaint were filed against Mr. Mahmoud.  Upon the filing of the TRO, Mr. Mahmoud's service weapon was removed in accordance with Attorney General Law Enforcement Directive No. 2000-3 ("A.G. Directive").  In the course of the investigation lead by Kevin D. Wronko, Chief Assistant Prosecutor of the County of Passaic, Mrs. Hajisniel admitted that she was regularly beaten by Mr. Mahmoud with a belt.  Mrs. Hajisniel additionally admitted that Mr. Mahmoud bit her on this particular occasion.  Photographs were taken of the physical injuries.  However Mrs. Hajisniel failed to testify at the Municipal Court proceeding.  The charges against Mr. Mahmoud were ultimately dismissed, including the domestic violence charges and the TRO.  Mrs. Hajisniel refused to seek a permanent restraining order.  Mr. Mahmoud was ultimately exonerated of the charges.

The independent investigation conducted by the county prosecutor's office in accordance with the A.G. Directive considered whether Mr. Mahmoud's service weapon should be returned.  The investigation included evaluations by psychologists Dr. Betram Rotman and Dr. Daniel

Schievella, the latter of Mr. Mahmoud's choosing, and both concluded that Mr. Mahmoud should not be rearmed.  Following a two and a half year investigation, the county prosecutor's office ultimately decided against rearmament.  Thereafter, on November 3, 2006, Mr. Mahmoud was terminated due to his inability to perform his duties of as a police officer.  Specifically Mr. Mahmoud's termination was based on the decision of hearing officer Sylvan Rothenberg, a Retired New Jersey Superior Court Judge, who reviewed the uncontradicted evidence in light of the mandatory language set forth by the City of Paterson, the New Jersey Law Enforcement Handbook, and the New Jersey Department of Personnel job description. The hearing officer concluded that because Mr. Mahmoud was required to carry and maintain a firearm, he was unable to perform his duties and should be terminated. (Defs.' Ex. E.)

Mr. Mahmoud contested the hearing officer's finding and petitioned the Superior Court of the County of Passaic to find that the county prosecutor's conclusion to not rearm him constituted an abuse of discretion.  A hearing followed in which Mr. Mahmoud was represented by counsel and presented witnesses and expert testimony.  On June 11, 2010, the Honorable Donald Volkert, A.J.S.C. issued a written Opinion finding no abuse of discretion by the county prosecutor.

Judge Volkert explained the basis for his conclusion of no abuse of discretion, in part:

> In the instant case, the county prosecutor conducted a two-and-a-half year review of the entire Internal Affairs file from the Paterson Police Department, evaluation of numerous police and psychological reports, including photographs of Hajismaiel's injuries, discussions with the officer's department, interview and statements of the alleged victim, consideration by members of the Domestic Violence Unit, and correspondence with defense counsel. (S20, Prosecutor's Letter Brief, April 1, 2009.)  The review included consideration of an incident when Mahmoud was

3

> reprimanded for not securing his gun, the domestic violence incident, Mahmoud's suspension for an incident with a female in custody, allegations from Hajismaiel's sister and mother, reports from officers who investigated the case closely, and psychological reports indicating narcissistic tendencies. One of the reports did not recommend re-arming. Furthermore, Mahmoud's psychological report when he first entered the force was borderline and cautioned of potential problems in the future.
>
> All factors the prosecutor based its decision on were relevant to Mahmoud's fitness to be armed because all factors dealt with Mahmoud's past behavior as an officer and his mental well-being. It does not appear that there was any clear error in judgment or abuse of discretion in the record. The prosecutor gave a rational explanation of the hearing, resting on the fact that the domestic incident alone was cause to disarm; however Mahmoud's file established at least two more incidents that increased the level of caution in the prosecutor's determination of Mahmoud's fitness. The totality of the circumstances was thoroughly considered, and the prosecutor decided that he should not be re-armed because the investigation showed that he was, based by their review, unfit to carry a duty weapon. Thus, the prosecutor did not abuse its discretion.

(Defs.' Ex. F.)

Notably, Mr. Mahmoud did not raise any allegations of discriminatory treatment before either the hearing officer or the Administrative Judge. Now, Mr. Mahmoud submits that he was discriminated against as a Palestinian Muslim during the process that lead to his disarmament and his eventual termination because he could have been assigned to duties not requiring a firearm.

Mr. Mahmoud points to what he believes is to be evidence of disparate treatment involving other police officers who were not terminated for similar or worse domestic violence. (Pl.'s Resp. to SUMF ¶ 7, citing Pl.'s Dep. at 17-25, 46-47, 49-55). Therein, Mr. Mahmoud attests that one officer, Raymond Heffernan, was disarmed due to a domestic violence incident

but was still allowed to continue to work for nine years in the radio room. (Pl.'s Dep. at 49). A closer examination of the record reveals that Mr. Heffernan's psychological evaluation recommended that he engage in an intensive counseling program, at the completion of which the treating doctor would provide a new fitness for duty recommendation. (Pl.'s Ex. 5.) This is apart from Mr. Mahmoud's psychological evaluations as described above. Next, Mr. Mahmoud testified that an African American Detective was permitted to carry his weapon only while on tour despite domestic violence charges. (Id. at 50). Third, Mr. Mahmoud summarily listed three additional individuals who had domestic violence charges and who eventually regained their rights to carry their weapons. (Id. at 51.) Essentially, because these other individuals are not Muslim American but were allowed to continue to work following charges of domestic violence, Mr. Mahmoud contends that he was discriminated against based on his protective status.

As further evidence of purported disparate treatment, Mr. Mahmoud also submits various incidents of punishment in which he was purportedly treated differently than other police officers due to his specific protected status. For example, Mr. Mahmoud contends that his five-day suspension without pay for failure to notify his change of address was discriminatory in light of similar incidents by other officers, although he was not "aware specifically" of the details of such incidents. (Pl.'s Dep. at 24.) Additionally, Mr. Mahmoud points to a two-to-three day suspension without pay which he received for leaving his weapon unsecured, specifically underneath the driver's seat of his private vehicle. (Id. at 25-27.) Mr. Mahmoud contends that "I know other officers who were not Arabic, not of my ethnicity, not of my background, that were treated differently." (Id. at 25.) Specifically, Mr. Mahmoud testifies that one other officer crossed state lines with an unsecured weapon, and the officer's gun was stolen in this process. Because this latter officer received no punishment for a heightened offense, Mr. Mahmoud

5

argues that his two-to-three day suspension was discriminatory based on his protective status. Upon further probing, Mr. Mahmoud revealed that he did not administratively challenge his treatment at the time despite the ready availability of his union representative. (Id. at 27.)

### 2. Procedural History

On November 2, 2010 Mr. Mahmoud filed the underlying complaint seeking redress for the deprivation of his rights pursuant to 42 USC 1981 and 1983 based on differential treatment due to his race, national origin, and ethnicity, by Defendants Chief of Police Widding, Police Director Walker, and the City of Paterson.

This matter comes before the Court on Defendants' motion for summary judgment. Specifically, Defendants argue that they are entitled to qualified immunity. Relatedly, Defendants contend that the county prosecutor had the sole responsibility of determining whether or not Mr. Mahmoud should have been rearmed, a matter which has already been settled before the Honorable Donald J. Volkert. Defendants thus argue that they were not responsible in the decision making authority to rearm Mr. Mahmoud. Defendants also identify the record on which the hearing officer, a retired Superior Court Judge, relied which served as the basis for his termination.

Mr. Mahmoud opposes the motion on the grounds that the Defendants are appropriate parties responsible for his termination. Mr. Mahmoud contends that the county prosecutor simply rubber stamps the recommendation made by Chief of Police Widding. Further, Mr. Mahmoud argues that he could have simply been reassigned to a position which did not require the carrying of a firearm. Mr. Mahmoud further maintains that that there is no collateral estoppel here because the discrimination claim was not litigated in the prior proceedings and because discovery did not reveal the basis for his discrimination claims at that point.

## II.     ANALYSIS

1. **Standard of Review**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In deciding whether a dispute of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine

issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. Id. at 251-52.

    **2. Discussion**

Attorney General Law Enforcement Directive No. 2000-3 (September 1, 2000) implements procedures for the seizure of weapons from municipal law enforcement officers involved in domestic violence incidents. The Directive clearly sets forth that the seizure or return of the weapon is within the discretion of the County Prosecutor's Office:

> The County Prosecutor's Office within whose jurisdiction the incident occurred should confer with the domestic violence complainant regarding the complainant's position on the return of weapons. However, the recommendation or determination whether the weapons should be returned rests with the County Prosecutor, not the victim or the law enforcement agency where the officer is employed.

(Defs.' Ex. C, Directive at 4.)

Similarly, Kevin D. Wronko, Esq., the former Chief Assistant Passaic County Prosecutor, explained that the recommendation by a police department has influence, but does not control his decision. (Defs.' Ex. D at 30:14 – 31:1.) Mr. Wronko's detail of his investigation corresponds with Judge Volkert's detailed summary of the county prosecutor's investigation, supra at 3-4. Mr. Wronko explained the basis of his decision that Mr. Mahmoud should not be rearmed:

> [W]e [ ] reviewed the police reports of the assault complaint. In the reports, it was indicated that the victim's mother and sister were concerned for her safety, and they contacted the Paterson Police Department which then opened up an investigation. And they spoke to the victim and she verified that she had been assaulted by the officer, as I recall.
>
> We then brought her into the office. In fact, I interviewed her, and I believe Detective Hector Jimenez was present, as well,

>because I usually don't interview somebody alone, and she verified that the assaults did happen, that he had hit her on prior occasions. And as I recall, she explained it that it is – she explained it away because she was a female, a member of the weaker sex, and the impression I had is that she felt it was okay to be assaulted, but at no time did she say that the assault did not occur. She said the assault did occur. I never had the impression she was being vindictive, out to get him or anything. In fact, she tried to minimize the situation by saying she is the weaker sex and this kind of behavior is apparently appropriate.
>
>And we looked at the photographs. And to be frank with you, those photographs were consistent on when I used to have child abuse cases. They were significant injuries.
>
>[ ]
>
>[W]e reviewed his file, police file, as I recall. We looked at his psych evaluation when he was hired, and which caught my eye was the fact that it was a marginal approval, that they, the doctor felt there might be some questions in the future, but not enough to preclude him from being hired. And then also of concern was that while he was not armed, he was working in the lock-up which you could do without a weapon, and an incident occurred between him and a female inmate which was sustained by the Paterson Police Department investigation.
>
>[ ]
>
>That was the basis to my decision.

(Defs.' Ex. D. at 57:13-59:6.)

Defendants rely on qualified immunity as an affirmative defense to any alleged discrimination here, and argue that their actions at all times were rational, non-bias, in compliance with the law, and objectively reasonable and carried out in good faith.

Qualified immunity relies on the notion of good faith, and is an affirmative defense in actions pleaded under the Constitution and laws of the United States, including Sections 1981 and 1983. See Harlow v. Fitzgerald, 457 U.S. 800, 815, n. 24 (1982). "Decisions by [the

9

Supreme Court] have established that the 'good faith' defense has both an 'objective' and a 'subjective' aspect. . . . [W]e have held that qualified immunity would be defeated if an official *knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury . . . ." Id. at 814 (internal citation omitted) (emphasis in original).

What this means in practice is that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Harlow, 457 U.S. at 819). "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' Harlow, 457 U.S. at 819 (quoting Pierson v. Ray, 386 U.S. 547, 554, n.34 (1967)).

As the Third Circuit Court of Appeals explained, the qualified immunity defense "balances the interest in allowing public officials to perform their discretionary functions without fear of a suit against the public's interest in vindicating important federal rights . . . [and thus,] objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." Ryan v. Burlington County, 889 F.2d 1286, 1292

(3d Cir. 1989). A party seeking damages from an official asserting qualified immunity bears the burden of overcoming the defense. See Anderson, 483 U.S. 635, 642 (1997).

      Here, two evidentiary proceedings took place in which Mr. Mahmoud was represented by counsel. Both proceedings closely reviewed the county prosecutor investigation which is legally required when an officer is involved in an incident of domestic violence. That investigation is independent of any recommendation made by the police department, although the county may take the recommendation into account. Here, following a two and a half year investigation that included review of psychiatric evaluations which did not recommend rearmament, the county prosecutor also concluded that Mr. Mahmoud should not be rearmed. The breadth of the investigation undermines Mr. Mahmoud's unsubstantiated allegation that it was simply a rubber stamp of the recommendation of the police department. A hearing officer relied on the investigation as a basis for termination, and a sitting Superior Court Judge affirmed that no prosecutorial misconduct was abound.

      Mr. Mahmoud's belated charge of racial, ethnic, and religious discrimination against the Chief of Police, Police Director, and the City of Paterson is simply unsubstantiated by the record. The Court notes that no facts have been offered against Police Director Walker here beyond the general claims alleged in the Complaint. That Mr. Mahmoud may be the only Muslim American on the Paterson police force who had a domestic violence charge made against him which resulted in his disarmament and eventual termination is not a sufficient basis on which a reasonable trier of fact would conclude that Defendants was motivated by discriminatory animus as a pretext for not placing him in a position which did not require that he carry a weapon. The record shows that the police department's election was objectively reasonable and made in good faith based on the extensiveness of the county prosecutor's investigation, which was also

validated by two subsequent evidentiary proceedings.  Other police officers who were involved in domestic violence incidents may not have had charges placed against them initially, or such charges may not have risen to the degree to recommend disarmament, or the psychiatric evaluations therein may have recommended counseling in lieu of disarmament.  The treatment of those officers is highly fact specific and contextual.  No facts in the record support so much as a suggestion of discriminatory pretext here.  The Defendants are therefore entitled to qualified immunity because their conduct was objectively reasonable, carried in good faith, and in compliance with the law.

### III.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted and the complaint against Defendants City of Paterson, Police Chief James Wittig, and Police Director Michael Walker is dismissed with prejudice.  The Court will enter an order implementing this opinion.

        **/s/ Dickinson R. Debevoise**_____
        DICKINSON R. DEBEVOISE, U.S.S.D.J.

**Date:**  May 21, 2014